McFarlAND, J.,
delivered the opinion of the court.
This action of ejectment was brought by the heirs of Thos. Hopkins to recover of Thos. Calloway a valuable island, known as “Jolly Island,” situated at the junction of the Tennessee and Hiwassee rivers, now in Meigs county. They recovered an undivided interest in the land sued for, and a new trial having been refused, Calloway's heirs, against whom the action was revived, have appealed in error.
The plaintiff’s title, under the charge of the Circuit Judge, was made out in the following manner: The island was granted by the State of North Carolina to John Hacket and Stokely Donelson, by grant dated the 17th July, 1794. Intermediate conveyances between one of the grantees — Stokely Donelson — and Thos. Hopkins, the ancestor of the plaintiffs, were read, but it is not necessary to set them forth particularly, — it is sufficient to say that they do not form a perfect chain of title from grantees to Hopkins; *375 but the plaintiffs read a deed from F. A. Ross to Thos. Hopkins, dated the 12th of October, 1822, purporting to convey the entire fee simple title to the island, and it is claimed that Thos. Hopkins held uninterrupted adverse possession of the ■ island for more-than seven years thereafter, claiming under said deed, and it .being granted land, his title became perfect, by virtue of the first section of the Act of 1819.
In answer to this, it is said for the defendants-that the grant to Hacket and Donelson was void, for reasons to be hereafter explained, and that no other-valid grants ever issued for the land until the issuance of the grants in 1850, under which the defendant claims.
For the plaintiffs it is not seriously denied that the the grant before referred to was originally void, and so the Circuit Judge held; but he also held that it was' cured and made valid by an act of the Legislature of Tennessee of 1819, ch. 50, and that from and after that date the island was granted land, and that seven years’ adverse possession by Hopkins after that date, claiming under' a color of title, would perfect his title to the island. The effect, therefore, of said Act of 1819 upon the grant in question, becomes-for the present a material question. Was the charge of the Circuit Judge upon this question correct?
In order to determine this question, it becomes important to ascertain the grounds upon which the grant was originally void. It was argued that it was void upon two grounds: 1. By the act of the Legislature of North Carolina, commonly called the Ces *376 sion Act, of 1789, the- territory embracing the land in question was ceded to the United States, and the cession accepted by an act approved the 2d of April, 1790; so that, at the date of the grant — 17th July, 1794 — the State of North Carolina had no title to the land in question, and could grant none. This was rmquestionably so, unless this grant comes within the savings of said act, which in substance is, so far as need be noticed, that in all cases where entries had been previously made agreeably to existing laws, the State of North Carolina reserved the right to perfect such title by the issuance of a grant; so that a grant from the State of North Carolina for lands lying within the territory ceded, dated ■ after the Cession Act had been accepted, but founded upon a valid entry made previously thereto, would be valid, but unless founded upon such previous entry, would be void, because the State making the grant had no title.
Two copies of the grant in question were read in evidence by the plaintiffs, showing some discrepancies, but in neither copy does it purport to be founded upon any previous entry, nor was any entry or other incipient right produced. It may, for the argument, be conceded that this would not be essential to the validity of a grant issued prior to Cession Act. After that act, however, the State of North Carolina had no power to issue the grant, unless it appear to 'be done in perfecting an incipient right under a previous entry or otherwise. But, as we have said, it does not appear in this case that the grant in question was founded upon any previous entry or other incipient *377 title. It does not upon its face purport to be, nor is any such previous entry or incipient right produced in evidence. ¥e are, therefore, of opinion that the grant was void for want of title in the State of North Carolina at its date. This was substantially held in Polk’s lessee v. Wendle, 5 Wheaton, 292; also Polk’s lessee v. Wendle, 9 Cranch, 87. This was the ground upon which the Circuit Judge held the grant to be void, until cured by the Act of 1819.
But, in the second place, it is argued that the grant was void because the Indian title to the land had not been acquired by treaty or otherwise. When the county of Washington was established in 1777, embracing the entire territory of Tennessee, an ■entry taker was appointed, and numerous entries were made, but previous thereto a treaty had been made, with the Cherokee Indians, by which their title was acquired to all the lands of said county lying east of a line running across upper East Tennessee by Chimney Top Mountain, passing the Holston at the mouth of Cloud’s Creek, afterward known as Brown’s line. The title of the Indians to the land west of this line still remained with them. Many of the entries that had been made lay west of the line. Thereupon, in April, 1778, the Legislature of North Carolina passed an act declaring void all entries made in Washington county of lands lying west of Brown’s line, and the entry takers were directed to refund all moneys paid for such lands. In April, 1783, an act was passed by the Legislature of North Carolina opening a land-office at Hillsborough, called John Arm *378 strong’s office, and under this act Brown’s line was abandoned, or, in other words, the entire State thrown open to entry, except certain reservations, among which was a reservation for the Indians. Without tracing the lines of this reservation, it is sufficient to say that the land in question is west of Brown’s line, and was still within the Indian reservation as established by the Act of 1783, although, as we have seen, a much larger scope of country was thrown open to entry by this latter act. John Armstrong’s office, however, was closed after the 25th of May, 1784, remaining open but a few months. The Indian title to the island was extinguished by the treaty of the 19th of March, 1819, in which the island is expressly named. It has been settled that Grants from North Carolina of lands reserved to the Cherokee Indians under their treaties, were void under the laws of that State; though, in the absence of laws expressly declaring such entries and* grants void, it might be a question whether a State could not have granted the fee subject to the right of the Indians. If the land in question was entered prior to the Act of April, 1783, then, as it lay west of Brown’s line, the entry was void, by the express terms of the Act of 1778 before referred to. If made in Armstrong’s office during the time it was open from April, 1783, to May, 1784, the entry was still in violation of the treaties and acts by which this land was still included within the Indian territory. If the Grant in question was one issued by the State of North Carolina after the Cession Act, but founded upon an' entry *379 made previous to the Act of 1783, then the only objection to the validity of the grant would be, that it was declared .void by the Act of 1778 because the land was west of Brown’s line. If made after the Act of 1783, in Armstrong’s office, it was not necessarily void 'because the land was west of Brown’s line, for entries might have been lawfully made west of Brown’s line; but it would still be subject to the objection that the land was within the Indian reservation. We are of opinion that the grant in this case, so far as now appears, was not one of the grants embraced by the Act of 1778.
We come now to consider the effect of the Act of 1819, which, it is argued, makes the grant valid. It is entitled “An Act to confirm and make good all grants issued by the State of North Carolina on entries and warrants made west of Brown’s line.” The preamble is as follows: “Whereas, in the year 1779-(this is probably a mistake in the date — it was in the year 1778) the State of North Carolina passed a law forbidding the entering of land west of a line called Brown’s line, which act declares all entries heretofore made and grants heretofore issued, and all entries hereafter made and grants hereafter issued, for any land west of the before described line, null and void,, and required the enterers to call on the entry taker and receive their money for said entry, yet said entry taker .never did refund said money, and said entries and warrants were perfected into grants; therefore,. Be it enacted by the General Assembly of the State of Tennessee, that all grants hereafter issued, and said *380 •entries and warrants, when the money was actually-paid, .shall be good and valid to all intents and purposes, both in law and equity.” Does this act make valid the grant in question ? To what class of grants .and entries does it apply ? It seems clear that it was intended to make valid that class of grants which by the Act of 1778 (or 1779, as it is called) were declared void, — that is, entries and grants founded thereon for lands lying west of Brown’s line, made at a time such entries and grants were forbidden. But it must certainly be understood that this act was only intended to remove that particular objection, that is, the objection that the entries and grants were void for the reason that the land was west of Brown’s ■line. In other words, if the grant be in other .respects valid, and void only for this particular reason, then the act in question was intended to remove the particular objection, and make the grant valid, upon the condition mentioned; so that, if this grant was one of the grants declared void by the Act of 1778, and was void for no other reason, then the Act of 1819 would apply, upon the conditions specified. But if this grant was void for the reason first stated, that is, because it was made after the State of North Carolina had parted with her title under the Cession Act, and not founded upon an entry made previous thereto, then this act was not intended to cure this defect or •make valid a grant of this character; in other words, in cases where grants were made by the @tate of North Carolina before the Cession Act, or where entries were made prior to said act, and grants issued *381 thereon afterwards, for land lying west of Brown's line, such entries and grants having for that reason been declared void by the Act of 1778, are by this act declared valid, upon the condition stated. But this act was never intended to make valid all grants issued by the State of North Carolina for lands lying within the territory of Tennessee, and made after the-former State had parted with all title and right to grant the same, under the Cession Act, and not founded upon entries made previous' to said act.
And this we understand to be the character of the present grant. It was made in 1794, after the State had parted with its title to the land. It does not appear to be founded upon any entry made previous to the Cession Act. It must, therefore, be regarded simply as a grant issued by the State of North Carolina, without any title or authority for doing so, and for this reason void; and we are of opinion that the Act of 1819 was not intended to have any application to a grant like this. A contrary construction would make all grants issued by said State, after the Cession Act, for lands in Tennessee, valid, without regard- to any previous entry. That act was' intended to make valid those grants issued by the State of North Carolina when said State might have rightfully granted the land, but for the prohibition in the Act of 1778. This grant, so far as now appears, was issued by the State of North Carolina without any color of title or authority whatever. The Act of 1819 removes the objection to the grant made by the Act of 1778, and leaves it as if that act had not *382 been passed. But with that act out of the way, this grant is still void for the reason already stated, and for a reason, not removed by the Act of 1819; this was certainly never intended. This makes it unnecessary to discuss the question, whether, in order to bring a grant within the provisions of the Act of 1819,' it must affirmatively appear that the money was actually paid, or whether the recital in the grant of the payment of the money is to be taken as prima facie true, and thus throw the burthen of proof upon the opposing party to show that the money was not paid. Not regarding the statute as applicable to this case, we do not deem it proper to determine the construction of it in cases where it is applicable. We therefore hold, that the Circuit Judge erred in charging the jury that the grant in question was made valid by the Act of 1819. So far as appears to us hi this record, said grant was void and remained so.
This leaves the title of the plaintiffs to defend upon other and different grounds, upon which, however, the case was not presented to the jury in the charge, and the questions in regard thereto are not now before us. The error indicated changes the entire aspect of the case. We do not regard it proper to notice other questions argued, as it is not necessary that they should be settled.
For the error indicated, the judgment is reversed and a new trial awarded.